# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHARLES MILLER,

                 Plaintiff,

    v.

UNITED STATES DEPARTMENT
OF JUSTICE,

                 Defendant.

Civil Action No.  05-1314  (HHK)

## MEMORANDUM OPINION

This action, which is brought under the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552, is before the court on defendant's motion for summary judgment.  For the reasons set forth

below, the motion will be granted in part and denied in part.

## I.  BACKGROUND

On or about March 16, 2003, plaintiff sent a FOIA request to the Federal Bureau of

Investigation headquarters office in Washington, D.C. ("FBIHQ") seeking information about

himself including, but not limited to: "(1) arrest records, (2) investigation and/or investigatory

reports, (3) reports or evidentiary and/or scientific information findings, (4) wants, warrants,

and/or detainers, (5) final and closing investigation reports; and (6) any and/or all information,

data, or reports not otherwise exempt by statute."  Complaint ("Compl."), Exhibit ("Ex.") A

(FOIA Request).  In response, on September 8, 2004, FBIHQ released 191 pages of redacted

records and indicated that the redactions had been made pursuant to FOIA Exemptions 7(C) and

1

7(D).  In addition, FBIHQ notified plaintiff that it withheld another 62 pages of records pursuant

to FOIA Exemption 3.  Plaintiff unsuccessfully appealed FBIHQ's decision to the Justice

Department's Office of Information and Privacy ("OIP").

Plaintiff filed the instant civil action in June 2005.  His response to defendant's motion

for summary judgment prompted FBIHQ to conduct a second search for records responsive to his

FOIA request.  As a result of the second search, FBIHQ located a Legal Attache ("Legat")

Bridgetown main file, and from this file promptly released 63 pages of redacted public source

documents, indicating that the redactions had been made pursuant to FOIA Exemptions 1, 2, 5, 6,

7(A), 7(C), 7(D), and 7(F).  Later, FBIHQ released 323 pages, out of 1,440 pages reviewed,

indicating that the redactions had been made pursuant to FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D),

7(E) and 7(F).

Among the responsive FBIHQ records located were documents which originated in full or

in part with other government agencies or other components of the United States Department of

Justice ("DOJ").  Documents were referred to the DOJ's Criminal Division,[1] the Bureau of

Alcohol, Tobacco, Firearms and Explosives ("BATFE"),[2] the Defense Intelligence Agency

("DIA"),[3] the Drug Enforcement Administration ("DEA"),[4] the Department of Defense

---

[1]    Of the six documents (44 pages of records) referred by FBIHQ, the Criminal Division
referred three of them (Nos. 3A, 3B, and 3D) to EOUSA.  Def.'s Reply, Declaration of Kathy
Hsu ("Hsu Decl.") ¶ 6 & Ex. 3.

[2]    BATFE released in part the five pages of records referred to it by FBIHQ after redacting
certain information under FOIA Exemptions 2, 3, and 7(C).  Def.'s Reply, Declaration of Averill
P. Graham ("Graham Decl.") ¶ 5.

[3]    FBIHQ forwarded five documents (93 pages of records) to DIA, Def.'s Reply,
Declaration of Brian S. Kinsey ("Kinsey Decl.") ¶ 5, and the Department of Defense ("DOD")

(continued...)

("DOD"),[5] the Department of State ("State Department"),[6] and to the Department of the Army

("Army")[7] for direct response to plaintiff.  In addition, FBIHQ forwarded 312 pages of records to

---

[3](...continued)
forwarded to DIA three additional documents (43 pages of records) referred to DOD by FBIHQ.
*Id.* ¶ 6.  Of the documents referred by DOD, it was determined that one document was a
duplicate of a document referred directly to DIA by FBIHQ, and a third document was referred
by DIA to the United States Air Force.  *Id.* ¶ 6.  The Air Force withheld the document in full
pursuant to FOIA Exemption 1.  Def.'s Reply, Declaration of Richard M. Abboud ("Abboud
Decl.") ¶¶ 6, 8.  Of the six documents remaining with DIA, four were withheld in full under
FOIA Exemption 1 and the remaining two documents were released in part after redacting
information under FOIA Exemptions 1, 2, 3 and 6.  *See* Kinsey Decl., Attach. (*Vaughn* Index).

[4]      FBIHQ referred records to DEA in three batches.  Def.'s Reply, Fourth Declaration of
David M. Hardy ("Hardy IV Decl.") ¶ 104.  From the first referral, assigned DEA FOIA Request
No. 07-0080-P, DEA released in part 10 pages of records after redacting certain information
under FOIA Exemptions 2, 7(C), 7(D), and 7(F).  Wassom Decl. ¶¶ 6-7.  At the time defendant's
Reply was filed, classified records contained in the second and third referrals, assigned DEA
FOIA Request Nos. 07-00234-P, 07-0339-P and 07-0644-P, were undergoing review at DEA's
El Paso Intelligence Center.  *See id.* ¶¶ 8-14, 19-20.  The Court has granted defendant a second
extension of time to October 15, 2008 to file a supplement regarding these materials.

[5]      FBIHQ referred 43 pages of records to DOD.  Hardy IV Decl. ¶ 105.  DOD referred all 43
pages to DIA.  Kinsey Decl. ¶ 6.

[6]      FBIHQ referred 193 pages of records to the State Department, Hardy IV Decl. ¶ 106, and
the State Department organized them into 57 separate documents.  Def.'s Reply, Declaration of
Margaret P. Grafeld ("Grafeld Decl.") ¶ 4.  In turn, the State Department referred twelve
documents to DEA for its review and reply back to the State Department.  *Id.* ¶ 5.  As of the
filing of defendant's Reply, DEA had not responded to the State Department's referral.  *Id.*  The
State Department mentioned its receipt of "six documents that were referred to another
[unidentified] agency for review and direct reply to plaintiff [which] were also referred to DEA."
*Id.* ¶ 6.  Of the remaining documents, the State Department "determined that nine documents
may be released in full, twenty-three documents must be withheld in part, [and] seven documents
must be withheld in full."  *Id.* ¶ 4.

[7]      FBIHQ referred four pages of records to the Army.  Hardy IV Decl. ¶ 107.  In total, there
were four documents located by FBIHQ "fall[ing] under the cognizance of the [Army's]
Intelligence Directorate," Def.'s Reply, Declaration of Richard Ellis ("Ellis Decl.") ¶ 4, and two
documents "fal[ling] under the cognizance of the [Army's] Operations Directorate."  *Id.*,
Declaration of Salvatore F. Cambria ("Cambria Decl.") ¶ 4.  The Intelligence Directorate
(continued...)

"another government agency for direct response to plaintiff."  Hardy IV Decl. ¶ 108.  FBIHQ,

however, did not identify the agency and the record of this case does not explain the disposition

of these records.

By this action, plaintiff challenges the responses to his FOIA request.[8]

## II.  DISCUSSION

### A.  Summary Judgment in a FOIA Case

The court should grant a motion for summary judgment when the pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits or declarations, show

that there is no genuine issue of material fact and that the moving party is entitled to judgment as

a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating an

absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Factual assertions in the moving party's affidavits may be accepted as true unless the opposing

party submits his own affidavits or declarations or documentary evidence to the contrary.  *Neal v.*

*Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

In a FOIA case, the court may grant summary judgment based on the information

---

[7](...continued)
released the four documents in part after redacting certain information under FOIA Exemptions
1, 2 and 6.  Ellis Decl. ¶ 20 & Ex. 1-4 (copies of redacted records).  The Operations Directorate
released one document in full and redacted information from the second document pursuant to
FOIA Exemption 1.  Cambria Decl. ¶ 15 & Ex. 1-2 (copies of redacted records).

[8]      Defendant's Reply addresses FBIHQ's second search for responsive records and the
decisions of FBIHQ and other agencies or DOJ components to which FBIHQ referred responsive
records.  Plaintiff did not file a Surreply or any paper indicating his opposition to these decisions.
The Court does not treat defendant's summary judgment motion as conceded, however.  It is
clear that plaintiff has not abandoned this lawsuit, as he recently has filed, and the court granted,
his unopposed Motion Requesting Leave of Court to Supplement the Pleadings.  Accordingly,
the Court addresses each entity's response to his FOIA request in this Memorandum Opinion.

provided in affidavits or declarations when the affidavits or declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Central Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### B. FBIHQ's Searches for Responsive Records

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *Campbell v. United States Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) (requiring agency to conduct its search using methods reasonably expected to produce requested information). The agency bears the burden of showing that its search was calculated to uncover all relevant documents. *Steinberg v. United States Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994). To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search. *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982). In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with FOIA.

*Id*. at 127. But if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt*, 897 F.2d at 542.

### 1. FBIHQ's Central Records System

In its Central Records System ("CRS"), the FBI maintains its "administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes." Defendant's Motion for Summary Judgment ("Def.'s Mot."), Declaration of David M. Hardy ("Hardy I Decl.") ¶ 11. The records are organized by subject matter, and a file's subject matter may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. General indices, which consist of index cards arranged in alphabetical order, are the means by which CRS records are retrieved. Entries in the general indices are either "main" entries or "reference" entries. *Id.* ¶ 13. The former "carr[y] the name corresponding with a subject of a file contained in the CRS;" the latter "are generally only a mere mention or reference to an individual, organization, etc., contained in a document located in another 'main' file." *Id.* FBIHQ's policy "is to search for and identify only 'main' files responsive to [FOIA] requests," unless a requester specifically asks for a search of cross-references. Defendant's Fourth Motion for Enlargement of Time, Second Declaration of David M. Hardy ("Hardy II Decl.") ¶ 5.

The decision to index names other than subjects, suspects, and victims is left to the discretion of the assigned Special Agent, the Supervisory Special Agent at the field office conducting the investigation, and the Supervisory Special Agent at FBIHQ. Hardy I Decl. ¶ 16. Without an index, "information essential to ongoing investigations could not be readily retrieved. The FBI files would be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI." *Id.* ¶ 17. Thus, general indices to the CRS files "are the means

by which the FBI can determine what retrievable information, if any," its files may contain on a particular subject. *Id.*

## 2. File Number 245-HQ-657

To locate records pertaining to a particular subject, such as plaintiff, FBIHQ staff search by the subject's name in the CRS index. Hardy I Decl. ¶ 14. In this case, the search located one main file, 245-HQ-657, which "contain[s] information regarding a multi-subject drug investigation of numerous co-conspirators." *Id.* ¶ 18. Its universal case file number indicates that the Organized Crime Drug Enforcement Task Force (245) conducted the investigation, that FBIHQ was the investigation's office of origin (HQ), and that it was assigned an individual case file number (657). *Id.* ¶ 15(a).

Plaintiff challenged the adequacy of FBIHQ's initial search for responsive records asserting that he "had contact with certain agents of the FBI since [the] early 1990'[s] and [had] information based on reliable sources that the FBI was involved with investigative operations related to [him] throughout the 1990's." Affidavit of Charles E. Miller in Support of Opposition to Summary Judgment ("Pl.'s Aff.") ¶ 5. These investigations pertained to drug trafficking on the island of St. Kitts and events occurring while plaintiff was incarcerated at a United States Penitentiary. *See id.* ¶¶ 6-11. According to plaintiff, FBIHQ "should have [] additional records related to [him] considering [his] extensive history and association with international figures deeply involved in both illegal activity as well as law enforcement activities." *Id.* ¶ 13. He argued that FBIHQ was not "acting in good faith by claiming that no other records exist on [him] at FBI that post-date" his prosecution resulting from the investigation of his activities in Rochester, New York. *Id.*

3.  File Number 163A-BB-610

Plaintiff's challenge to the first search prompted FBIHQ to conduct a "second search of the indices to the headquarters CRS, to include both main files and cross-references."  Hardy II Decl. ¶ 5.  Staff used variants of plaintiff's name and alias, Cecil Connors, as search terms, and used his "date of birth to facilitate the identification of responsive records."  *Id.*  In this manner, FBIHQ staff located a Legal Attache ("Legat") Bridgetown main file, 163A-BB-610, entitled "Foreign Police Cooperation," *id.* ¶ 6, and several cross-references which ultimately led to the discovery of "documents . . . in files classified as Foreign Political Matters, Administrative Matters and Racketeering Enterprise Investigation."  Hardy IV Decl. ¶ 12.  File Number 163A-BB-610 "[i]nadvertently [was] serialized in CRS as a cross-reference on plaintiff."  *Id* n.8.

FBIHQ cured any defect in its first search by conducting a second search.  The court concludes that, taken together, the searches of  FBIHQ were reasonable and calculated to uncover all relevant records.

*C.  Exemptions*

Each agency bears the burden of justifying its decision to withhold records or portions of records.  *See* 5 U.S.C. § 552(a)(4)(B).  Its declarant must describe the records withheld and show that the records fall within the claimed exemption or exemptions.  *Canning v. United States Dep't of Justice*, 848 F. Supp. 1037, 1043 (D.D.C. 1994).  FBIHQ addresses this obligation by submitting declarations and *Vaughn* indices from which the court may "derive . . . a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure."  *Manna v. United States Dep't of Justice*, 832 F. Supp. 866, 873 (D.N.J. 1993) (internal quotation marks and citation omitted).

8

1. Exemption 1

Exemption 1 protects matters that are:

> specifically authorized under criteria established by an Executive order to be kept
> secret in the interest of national defense or foreign policy and (B) are in fact properly
> classified pursuant to such Executive order[.]

5 U.S.C. § 552(b)(1)(A).  Pursuant to Executive Order 13292, 68 Fed. Reg. 15,315 (Mar. 28,

2003), information may be classified only if all of the following conditions are met:

(1)     an original classification authority is classifying the information;
(2)     the information is owned by, produced by or for, or is under the control of the
        United States Government;
(3)     the information falls within one or more of the categories of information
        listed in section 1.4 of this order; and
(4)     the original classification authority determines that the unauthorized
        disclosure of the information reasonably could be expected to result in
        damage to the national security, which includes defense against transnational
        terrorism, and the original classification authority is able to identify or
        describe the damage.

Exec. Order No. 13292 § 1.1(a).[9]  The phrase "damage to the national security" means "harm to

the national defense or foreign relations of the United States from the unauthorized disclosure of

information, taking into consideration such aspects of the information as the sensitivity, value,

utility, and provenance of that information."  Exec. Order. No. 13292 § 6.1(j).  Information may

be classified either at the "top secret," "secret" or "confidential" level, id. § 1.2(a), and such

classified information must fall within one of the following categories:

(a)     military plans, weapons systems, or operations;
(b)     foreign government information;
(c)     intelligence activities (including special activities), intelligence sources or
        methods, or cryptology;
(d)     foreign relations or foreign activities of the United States, including

---

[9]     Exec. Order No. 13292 further amends Exec. Order No. 12958, 60 Fed. Reg. 19,825
(Apr. 20, 1995), as amended.

confidential sources;

(e)     scientific, technological, or economic matters   relating to the national
        security, which includes defense against transnational terrorism;

(f)     United States Government programs for safeguarding nuclear materials or
        facilities;

(g)     vulnerabilities or capabilities of systems, installations, infrastructures,
        projects, plans, or protection services relating to the national security, which
        includes defense against transnational terrorism; or

(h)     weapons of mass destruction.

*Id.* § 1.4.

In a FOIA case, the court determines *de novo* whether an agency properly withholds

information under a claimed exemption.  *See, e.g., King v. United States Dep't of Justice,* 830

F.2d 210, 217 (D.C. Cir. 1987).  This is true even if national security matters are at issue.  *See*

*Halperin v. Central Intelligence Agency*, 629 F.2d 144, 148 (D.C. Cir. 1980).  Courts generally

defer to agency expertise in national security matters, however.  *See, e.g., Taylor v. Dep't of the*

*Army,* 684 F.2d 99, 109 (D.C. Cir. 1982) (according "utmost deference" to classification

affidavits); *Goland v. Central Intelligence Agency*, 607 F.2d 339, 352 (D.C. Cir. 1978), *cert.*

*denied*, 445 U.S. 927 (1980); *see also Krikorian v. Dep't of State*, 984 F.2d 461, 464-65 (D.C.

Cir. 1993) (acknowledging "unique insights" of executive agencies responsible for national

defense and foreign relations).

a.  Military Plans, Weapons Systems, or Operations – Section 1.4(a)

Among the records responsive to plaintiff's FOIA request are documents discussing a

possible noncombatant evacuation operation ("NEO").  Def.'s Reply, Declaration of Richard

Ellis ("Ellis Decl.") ¶ 12.[10]  Although the events giving rise to the discussion of the NEO have

---

[10]     Brigadier General Richard Ellis is the Director of Intelligence for the United States
Southern Command (USSOUTHCOM) headquartered in Miami, Florida.  Ellis Decl. ¶ 1.  His
(continued...)

passed, "disclosure of this information today would give great insight to individuals who could exploit that information to frustrate the future attempts by our military and U.S. Government to protect its citizens abroad and to evacuate them safely in the event it becomes necessary."  *Id.* ¶ 13.  For these reasons, the Army redacts information regarding "[NEO] plans and security operations, plans for government personnel movements and responsibilities during a NEO, as well as host nation security forces involvement during a NEO and intelligence used to support a military plan."  *Id.* ¶ 12.

The court concludes that the declarant's explanation adequately supports the Army's decision to withhold information pertaining to military operations under Exemption 1 as its release "could reasonably be expected to seriously damage national security."  Ellis Decl. ¶ 20.

b.  Foreign Government Information – Section 1.4(b)[11]

---

[10](...continued)
responsibilities include "providing . . . intelligence to support engagement, counterdrug, contingency and force protection operations within USSOUTHCOM's Caribbean and Latin American area of responsibility."  *Id.*  He is designated as an Original Classification Authority for information up to the secret level.  *Id.* ¶ 2.  He declares that the secret information at issue here satisfies the substantive and procedure requirements of Exec. Order No. 12958 as amended by Exec. Order No. 13292.  *Id.* ¶ 10.

[11]      The term "foreign government information" means:

(1)      information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence;

(2)      information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement, or both, are to be held in confidence; or

(3)      information received and treated as "foreign government information" under

(continued...)

11

*i.* Army

Of the two classified documents falling "under the cognizance of the Operations Directorate," Def.'s Reply, Declaration of Salvatore F. Cambria ("Cambria Decl.") ¶ 4, the Army released one classified document in full. *See id.* ¶ 5 & Ex. 1.[12]  It declassified the second classified document in part and redacted it to protect certain portions under Exemption 1 as foreign government information. *Id.* ¶ 6 & Ex. 2.  The disclosure of this information, the Army stated, "could reasonably be expected to cause serious damage to the national security." *Id.* ¶ 11.

The Army explains that the activities of the Operations Directorate of the United States Southern Command ("USSOUTHCOM") depend "heavily on the cooperation of host nation countries and their forces in providing [USSOUTHCOM] with information that both helps [USSOUTHCOM] understand their vulnerabilities and capabilities, but also builds and maintains a level of trust that provides [] a source of information for a variety of purposes."  Cambria Decl. ¶ 13.  "Disclosure of information gathered by the United States either about or by a foreign country could have negative diplomatic consequences between the two countries and may

---

[11](...continued)
        the terms of a predecessor order.

Exec. Order No. 13292 § 6.1(r).

[12]     Brigadier General Salvatore F. Cambria is the Director of Operations for USSOUTHCOM.  Cambria Decl. ¶ 1.  The Operations Directorate "conducts [] theater engagement and counter-narcoterrorism activities in order to promote democracy, stability, and collective approaches to regional security."  *Id.*  The Directorate "responds, when required, unilaterally or multilaterally to crises that threaten regional stability or our national interest."  *Id.*  Brig. Gen. Cambria is designated as an Original Classification Authority for information up to the secret level.  *Id.* ¶ 2.  He declares that the records at issue satisfy the substantive and procedural requirements of Exec. Order No. 12958 as amended by Exec. Order No. 13292.  *Id.* ¶ 10.

jeopardize reciprocal confidentiality between the two." *Id.* ¶ 12. If information sharing between countries were hindered, the United States' "ability to assess a situation and act accordingly in carrying out [its] mission [by] respond[ing] to a crisis that threatens our national interest" may be limited severely. *Id.*

The Court concludes that the Army properly withheld this classified foreign government information under Exemption 1 as its release reasonably could be expected to damage the national security.

*ii*. State Department

The State Department first remarks that confidentiality and mutual trust are essential to successful diplomatic exchanges. Def.'s Reply, Declaration of Margaret P. Grafeld ("Grafeld Decl.") ¶ 19.[13] "Unwillingness or inability to maintain confidentiality in diplomatic exchanges would inevitably chill our relations with other countries" and "diminish [] access to sources of information important to the successful implementation of U.S. foreign policy." *Id.* If confidential information were disclosed, foreign officials likely would believe that "U.S. officials are not able or willing to observe the confidentiality expected in such exchanges." *Id.* This belief, in turn, would lead foreign governments to be "less willing in the future to furnish information important to the conduct of U.S. foreign relations, and in general less disposed to cooperate with the United States in the achievement of foreign policy objectives of common interest." *Id.* In this way, disclosure of information "reasonably could be expected to result in

---

[13]    Margaret P. Grafeld is the State Department's Information and Privacy Coordinator and in this capacity she is "authorized to classify and declassify national security information pursuant to [Exec. Order No.] 12958, as amended." Grafeld Decl. ¶ 1. She declares that the classified information at issue "continues to meet the classification criteria of [Exec. Order No.] 12958, as amended." *Id.* ¶ 12; *see id.* ¶¶ 19, 21, 71, 81, 93.

damage to the national security." *Id.*

The State Department also relies on confidential sources, who may be private individuals or foreign government officials, in conducting foreign affairs. Grafeld Decl. ¶ 23. "Sources often provide information only because they are confident that their identities will be protected," and a breach of this trust "undoubtedly will result in the unwillingness or inability of the source to provide further information." *Id.* If the United States were to disclose the identities of confidential sources, the declarant explains that "damage to the climate of confidence that facilitates the conduct of relations beneficial to vital U.S. interests" would result. *Id.* The State Department's explanations provide adequate support for its decisions to withhold information obtained by the United States government in confidence from foreign government officials deemed "essential to the formulation and successful implementation of U.S. foreign policy." *Id.* ¶ 19. The records relevant to this discussion are telegrams from Embassy Bridgetown to the State Department containing foreign government information classified either at the secret or confidential level.

First, the State Department withholds in full or in part portions of a series of telegrams (Docs. F36, F37, F47, F50 and F51) from Embassy Bridgetown to the State Department to the extent that they contain foreign government information. *See* Grafeld Decl. ¶¶ 62-66. One telegram (Doc. F36) "recounts a candid exchange between an Embassy official and a high-level St. Kitts government official" regarding "the extradition case of three drug kingpins." *Id*. ¶ 68. Another (Doc. F37) includes information provided to Embassy officials by high-level Kittian officials regarding extradition proceedings of plaintiff and his co-defendants. *Id.* ¶ 69. A third telegram (Doc. F47) is redacted to protect an analysis of "the meaning of a flawed Kittian court

14

order in plaintiff's extradition case[] addressing the possibility of judicial corruption." *Id.* ¶ 70. All of a fourth telegram (Doc. F51) and portions of a fifth telegram (Doc. F50) are withheld to protect a discussion of "possible corruption and drug traffickers' influence in St. Kitts." *Id.* ¶ 71.

A second series of telegrams (Docs. F31, F34, F39, F40, F42 and F43), "analyze[s] in detail threats to the physical safety of American citizens on St. Kitts, the U.S. government's planned response, . . . and the St. Kitts police response and capabilities." Grafeld Decl. ¶ 81. Included in these telegrams is information "provided by St. Kitts officials and indicate involvement at important levels of the island's government." *Id.*

From a third set of telegrams (Docs. F25, F35, and F52), the State Department withholds confidential information obtained from foreign governments in a description of the United States' "judicial strategy and tactics of prosecuting [plaintiff's] extradition case." Grafeld Decl. ¶ 93. Disclosure of this information, the declarant asserts, "would anger government officials and cause damage to our bilateral relationship" with St. Kitts. *Id.* Two telegrams (Docs. F27A and F48) include "candid assessments of St. Kitts' top officials, reported in confidence to U.S. officials, including the situation in the context of upcoming Kittian elections," *id.* ¶ 99, and four other telegrams (Docs. F33, F40A, F46 and F49) include information pertaining to "a discussion between a U.S. and a high level Kittian government official about next steps in plaintiff's extradition case." *Id.* ¶ 107.

The court concludes that the State Department properly withholds these telegrams in full or in part under Exemption 1 because they contain foreign government information, the release of which reasonably could be expected to result in damage to national security. *See, e.g., Krikorian*, 984 F.2d at 465 (holding that a telegram reporting discussion between agency official

and high-ranking foreign diplomat regarding terrorism properly was withheld because its release "would jeopardize 'reciprocal confidentiality'" between governments).

In addition, the State Department justifies its decisions to withhold these same telegrams in part because the information contained therein falls within the category of "foreign relations or foreign activities of the United States, including confidential sources," under Exec. Order No. 13292 § 1.4(d), the disclosure of which would endanger the United States' relationship with St. Kitts. The declarant explains that contents of these telegrams include "confidential sources and sensitive aspects of U.S. foreign relations, including, in particular, issues relating to the complicated extradition of a powerful and influential criminal." Grafeld Decl. ¶ 22. The "complex nature of this [extradition] matter, including the fear and power exercised by the subject of the extradition action" leads the declarant to conclude that "certain information related to it has the potential to damage [United States] relations with and access to the government of St. Kitts." *Id.* The court accepts the agency's assessment that the information properly is classified and concerns foreign relations or foreign activities of the United States, including confidential sources, for purposes of Exec. Order No. 13292 § 1.4(d). *See* Grafeld Decl. ¶¶ 22, 69-71, 81, 93, 99, 107. This information, too, properly is withheld under Exemption 1.

### *iii.* Air Force

According to the Air Force, the one document referred to it contains foreign government information, the release of which could cause serious damage to national security. Def.'s Reply, Declaration of Richard M. Abboud ("Abboud Decl.") ¶¶ 8-9.[14] Its declarant does not identify or

---

[14]    Richard M. Abboud is the Deputy Director of Operations for Headquarters, Air Force Office of Special Investigations. Abboud Decl. ¶ 1. He is authorized to "review[] classified

(continued...)

describe the document itself and does not articulate the potential damage that could result from its disclosure.  The Air Force does not meet its obligation under FOIA by justifying its decision to withhold this document in full.

### c.  Intelligence Sources or Methods – Section 1.4(c)

#### i.  FBIHQ

FBIHQ withholds "detailed information provided by a human intelligence source targeted at a specific individual or organization of national security interest."  Hardy IV Decl. ¶ 25.[15] Because the information "is specific in nature and reflects a specific vantage point from which the source is reporting," its disclosure "would identify the intelligence source."  *Id.*  The source's physical well-being or that of his or her family members or associates could be jeopardized, or they may be subjected to "public ridicule and/or ostracism" if his or her identity were disclosed. *Id.* ¶ 28.  In addition, because the information "pertains to national security matters," its disclosure "could reasonably be expected to result in damage to the FBI's intelligence and counterintelligence gathering capabilities."  *Id.* ¶ 26.  "[P]ublicly identifying sources utilized in intelligence investigations" would negatively impact "the FBI's ability to protect and recruit intelligence sources in the future."  *Id.* ¶ 27.  For these reasons, the declarant concludes that the unauthorized disclosure of information provided by this human intelligence source could

---

[14](...continued)
information to determine whether it can be released."  *Id.* ¶ 3.  He declares that the one document at issue was "classified by an original classification authority pursuant to [Exec. Order No.] 12958, as amended," *id.* ¶ 7, and "is properly classified at the 'Secret' level."  *Id.* ¶ 9.

[15]        David M. Hardy is the Section Chief of the Record/Information Dissemination, Records Management Division, at FBIHQ.  Hardy IV Decl. ¶ 1.  In this capacity he is designated as an original classification authority and a declassification authority pursuant to Exec. Order No. 12958, as amended.  *Id.* ¶ 2.

reasonably be expected to cause serious damage to the national security. *Id.* ¶ 22. The Court

concurs that this information properly is withheld under Exemption 1.

### *ii.* DIA

DIA withholds four documents (Nos. 1, 3-5) in full and redacts two documents (Nos. 2,

6) so that information classified at the secret level pertaining to or derived from intelligence

sources is protected from disclosure under Exemption 1. Def.'s Reply, Declaration of Brian S.

Kinsey ("Kinsey Decl.") ¶¶ 12-13.[16] Intelligence sources employed by DIA can be individuals

(foreign or American), foreign entities, and intelligence or security services of foreign

governments. *Id.* ¶ 10. These sources "can be expected to furnish information only when

confident that they are protected from retribution by the absolute secrecy surrounding their

relationship to the United States Government." *Id.* DIA further describes the potential harm to

an intelligence source whose identity is disclosed as follows:

> Sources who are compromised become extremely vulnerable to retaliation from a
> variety of entities including their own governments or others having a stake in the
> confidentiality of the information provided by the source. In certain parts of the
> world, the consequences of public disclosure to an individual that has served as a
> U.S. source are often swift and far reaching, from economic reprisals to possible
> harassment, imprisonment, or even death.

*Id.* ¶ 11. Accordingly, the declarant asserts that Exemption 1 protects from disclosure secret

information about or derived from intelligence sources because disclosure may damage national

security. *Id.* ¶¶ 12-13.

In addition, DIA withholds four documents (Nos. 1, 3-5) in full and redacts two

---

[16]    Brian S. Kinsey is the Chief of the Freedom of Information Act Staff, Defense
Intelligence Analysis Center, at Bolling Air Force Base in Washington, DC. Kinsey Decl. ¶ 1.
He declares that the information at issue "remains currently and properly classified under [Exec.
Order No.] 12958," as amended. *Id.* ¶ 17.

documents (Nos. 2, 6) so that information classified at the secret level pertaining "intelligence methodology" is protected. Kinsey Decl. ¶¶ 15-16. These documents contain information that "describes intelligence sources and methods, counternarcotics affiliations between DIA and other U.S. government entities and gaps in intelligence collection on counternarcotics." *Id.* ¶ 17.

Intelligence methods "are the means and the manner in which an intelligence agency collects information to support military operations, assist[s] in national policymaking, assess[es] military threats, and otherwise accomplish[es] its mission." Kinsey Decl. ¶ 14. According to DIA, such intelligence methods "must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, avoid or damage" the United States' intelligence operations. *Id.* For example, disclosure of information acquired by the United States government "could reasonably be expected to enable foreign authorities to identify U.S. intelligence activities, methods or sources, and to emplace countermeasures to them." *Id.* ¶ 17.

DIA clearly and sufficiently explains that damage to the national security potentially may result from disclosure of this classified information pertaining to intelligence sources and methods. Consequently, the court concludes that the information is properly withheld under Exemption 1.

### *iii*. State Department

The State Department withholds information that could "enable opponents of United States foreign policy objectives to identify U.S. intelligence activities, sources or methods and to undertake countermeasures that could frustrate the ability of the U.S. government to acquire information necessary to the formulation and implementation of U.S. foreign policy." Grafeld

19

Decl. ¶ 21.  "[D]isclosure of this information could put [a] human intelligence source in danger."
*Id.*

Under Exemption 1, the State Department withholds classified information contained in

six telegrams, the content of which is a detailed analysis of "threats to the physical safety of

American citizens on St. Kitts, the U.S. government's planned response, including intelligence

activities, and the St. Kitts' police response and capabilities."  Grafeld Decl. ¶ 81.  The telegrams

(Docs. F31, F34, F39, F40, F42 and F43) are withheld in part on the ground that their disclosure

would compromise intelligence activities, sources or methods.  *Id.*

One telegram (Doc. F46) includes information from intelligence sources "discuss[ing] the

activities of key narcotics trafficking organizations in the Caribbean, including plaintiff's

criminal activities and business alliances."  Grafeld Decl. ¶ 107.  The State Department

withholds this document in part on the ground that its disclosure compromises intelligence

sources.  *Id.*  For this same reason, the State Department withholds from another telegram (Doc.

F33) portions discussing "U.S. government options, in cooperation with top officials of the

government of St. Kitts, for dealing with a serious threat from plaintiff and his associates to the

physical security of American citizens on the island."  *Id.*

The State Department's explanation sufficiently supports its position that disclosure of

this classified information pertaining to intelligence sources and methods reasonably could be

expected to damage the national security.  Therefore, its decision to withhold this information

under Exemption 1 is proper.

*iv.*  Army

The Army redacts information pertaining to "intelligence sources and methods that if

released would compromise the tactics and techniques used to collect intelligence." Ellis Decl. ¶ 14. Within the scope of the term "intelligence methods" are "intelligence collection requirements that indicate intelligence gaps and would provide outsiders insight into methods and capabilities used to collect different types of intelligence." *Id.* Disclosure of such information "could significantly compromise" the Army's ability to collect intelligence, allow adversaries to operate more freely, and thus reduce the Army's ability to support its commanders in defending the United States. *See id.*

The Army adequately explains its decision to withhold classified information because it pertains to intelligence methods, the disclosure of which reasonably could be expected to damage the national security. Accordingly, this information properly is withheld under Exemption 1.

d.  Foreign Relations or Foreign Activities in the United States – Section 1.4(d)[17]

The Army withholds information "to protect foreign relations or foreign activities of the United States." Ellis Decl. ¶ 15. Release of such information could cause serious damage to the national security by compromising the Army's ability to collect intelligence, allowing adversaries to operate more freely, thus reducing the ability to support commanders and defend the country and its people. *Id.* As this information pertains to the evacuation of American citizens from St. Kitts and the involvement of St. Kitts authorities in planning such an operation, *see id.* ¶¶ 12-14, it falls within the category of foreign relations. Consqently, this information properly is withheld under Exemption 1.

e.  Vulnerabilities, Capabilities or Plans Relating to National Security – Section 1.4(g)

---

[17]    The court previously has concluded that the State Department properly withheld information concerning foreign relations and foreign government information, *see* Exec. Order No. 13292 § 1.4(c), (d), under Exemption 1.

The Army withholds information classified as secret pertaining to vulnerabilities, capabilities or plans relating to national security on the ground that it could reasonably be expected to cause serious damage to national security. Cambria Decl. ¶ 11. Its declarant explains that the "security and safety of the USSOUTHCOM hinges on [] continued trust with partner nations['] militaries and police forces." *Id.* ¶ 14. Disclosure of information about size, capabilities or strengths of partner nations' military and police forces may fall into the hands of an adversary, such that the partner nations' ability to protect their citizens and United States citizens working or travelling abroad may be weakened. *Id.* In addition, disclosure may "weaken[] the mutual relationship between the U.S. government and our partner nations[] supporting efforts in the region to combat narco-trafficking and terrorist threats." *Id.* These "confidences [] must endure in order to accomplish the military objections of the USSOUTHCOM Operations Directorate." *Id.* The Army thus demonstrates that its decision to withhold this information under Exemption 1 is proper.

### 2. Exemption 2

Exemption 2 shields from disclosure information that is "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The phrase "personnel rules and practices" is interpreted to include not only "minor employment matters" but also "other rules and practices governing agency personnel." *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051, 1056 (D.C. Cir. 1981) (en banc). The "information need not actually *be* 'rules and practices' to qualify under [E]xemption 2, as the statute provides that matter 'related' to rules and practices is also exempt." *Schwaner v. Dep't of the Air Force*, 898 F.2d 793, 795 (D.C. Cir. 1990).

Exemption 2 applies if the information that is sought meets two criteria. First, such information must be "used for predominantly internal purposes." *Crooker*, 670 F.2d at 1074; *see Nat'l Treasury Employees Union v. United States Customs Serv.*, 802 F.2d 525, 528 (D.C. Cir. 1985). Second, the agency must show either that "disclosure may risk circumvention of agency regulation," or that "the material relates to trivial administrative matters of no genuine public interest." *Schwaner*, 898 F.2d at 794 (citations omitted).

"Predominantly internal documents the disclosure of which would risk circumvention of agency statutes are protected by the so-called 'high 2' exemption." *Schiller v. Nat'l Labor Relations Bd.*, 964 F.2d 1205, 1207 (D.C. Cir. 1992). "High 2" exempt information is "not limited . . . to situations where penal or enforcement statutes could be circumvented." *Id.* at 1208. If the material at issue merely relates to trivial administrative matters of no genuine public interest, it is deemed "low 2" exempt material. *See Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 830-31 n.4 (D.C. Cir. 1983). "Low 2" exempt materials include such items as "file numbers, initials, signature and mail routing stamps, references to interagency transfers, and data processing references," *Scherer v. Kelley*, 584 F.2d 170, 175-76 (7th Cir. 1978), *cert. denied sub nom. Scherer v. Webster*, 440 U.S. 964 (1979), and other "trivial administrative data such as . . . data processing notations[] and other administrative markings." *Coleman v. Fed. Bureau of Investigation*, 13 F. Supp. 2d 75, 78 (D.D.C. 1998) (citation omitted).

a. FBIHQ

*i.* Telephone and Fax Numbers

From both main file 245-HQ-657 and Bridgetown main file 163A-BB-610, FBIHQ

withholds telephone and fax numbers of FBI Special Agents ("SAs") and FBI support

employees.  Hardy I Decl. ¶ 25; Hardy IV Decl. ¶ 34.  This information is related to the agency's

internal practices "in that these [telephone and fax] numbers are used by these employees during

the performance of their duties."  Hardy I Decl. ¶ 25.  Their disclosure neither serves a public

interest nor provides any public benefit.  *Id.* ¶ 26; Hardy IV Decl. ¶ 34.  Further, FBIHQ states

that disclosure of the numbers "could subject these individuals to harassing telephone calls which

could disrupt official business (including impeding the ability of SAs to conduct and conclude

law enforcement investigations in a timely manner)."  Hardy IV Decl. ¶ 34.  The same rationale

applies to FBIHQ's decision to withhold from Bridgetown main file 163A-BB-610 telephone and

fax numbers belonging to other federal agencies, including the State Department, DEA, and

BATFE, as the numbers are used by their personnel in performing their official duties.  *Id.* ¶ 35.

FBIHQ sufficiently justifies its decision to withhold the telephone and fax numbers as

"low 2" exempt information.  The numbers are predominantly for internal agency use and are

trivial administrative matters of no genuine interest to the public.

### *ii*.  Source Symbol Numbers

FBIHQ assigns a permanent source symbol number to a "confidential informant[] who

report[s] information to the FBI on a regular basis pursuant to an 'express' grant of

confidentiality."  Hardy IV Decl. ¶ 36.  The source symbol number "consists of a two-letter

abbreviation particular to the FBI field office where the symbol-numbered source is operating or

has operated, followed by a sequentially assigned number."  *Id.*  The number is an

"administrative reporting tool" and appears in all written reports of information provided by that

informant in place of his or her name in order to protect his or her identity.  *Id.*  Disclosure of the

source symbol number could "indicate both the scope and location of FBI informant coverage within a particular geographic area," and could "reveal [] connections to dates, times, places, events and names from which the source's identity could be deduced." *Id.* ¶ 37. According to FBIHQ, a source symbol number is an internal administrative tool of no genuine interest to the public. *Id.*

The court concludes that FBIHQ properly withheld a permanent source symbol number as "low 2" exempt information. *See, e.g., Lesar v. United States Dep't of Justice*, 636 F.2d 472, 485 (D.C. Cir. 1980) (upholding decision to withhold codes of this nature); *Long v. United States Dep't of Justice*, 450 F. Supp. 2d 42, 56 (D.D.C. 2006), *order amended on recons.*, 457 F. Supp. 2d 30 (D.D.C.), *and order amended*, 479 F. Supp. 2d 23 (D.D.C. 2007) (same).

b. BATFE

BATFE withholds under Exemption 2 "computer codes utilized for the organization of data in [BATFE's] Firearms Trace System Database." Def.'s Reply, Declaration of Averill P. Graham ("Graham Decl.") ¶ 8. These codes, BATFE explains, are for administrative purposes only and are of no legitimate interest to the public. *Id.* In addition, it states that the disclosure of these codes "would risk the circumvention of law enforcement and investigatory efforts" by "provid[ing] a computer-literate criminal with the means of decoding law enforcement data and potentially interfering with or altering [BATFE's] Firearms Trace System Database." *Id.* Thus, BATFE adequately justifies its decision to withhold these computer codes. *See Boyd v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 496 F. Supp. 2d 167, 171 (D.D.C. 2007) (concluding that data displayed on screen prints of Treasury Enforcement Communications System properly withheld under Exemption 2); *Truesdale v. United States Dep't of Justice*, No.

25

03-1332, 2005 WL 3273093, at *7 (D.D.C. July 22, 2005) (concluding that internal

administrative codes used in criminal law enforcement databases properly withheld).

### c.  DIA

DIA withholds portions of six documents "because they contain office symbols, internal

document or messaging codes, routing directions and telephone identifiers of U.S. government

agencies and offices engaged in the collection of foreign intelligence information."  Def.'s Reply,

Kinsey Decl. ¶ 19.  These are the types of trivial internal information of no interest to the public

properly withheld as "low 2" exempt material.  *See, e.g., Scherer*, 584 F.2d at 175-76.

### d.  DEA

DEA withholds Geographical Drug Enforcement Program ("G-DEP") codes and

NADDIS numbers, part of DEA's internal system of identifying information and individuals,

under Exemption 2.  Def.'s Reply, Declaration of Leila I. Wassom ("Wassom Decl.") ¶ 33.  A G-

DEP code is assigned when the agency opens a case file and it is used to "indicate the

classification of the violator, the types and amount of suspected drugs involved, the priority of

the investigation and the suspected location and scope of criminal activity."  *Id.* ¶ 33(a).

NADDIS numbers are "multi-digit numbers assigned to drug violators and suspected drug

violators known to the DEA."  *Id.* ¶ 33(b).  The numbers are unique to the violators to whom

they are assigned.  *Id.*  If a NADDIS number were disclosed, a requester would have "a means of

finding out not only drug violator information about the subject but also personal information

about [the violator], relatives and any third parties identifiable with the violator."[18]  *Id.*  Release

---

[18]    The DEA invokes Exemption 2 in conjunction with Exemption 7(C) to withhold
NADDIS numbers assigned to third parties.  Wassom Decl. ¶ 33(b).  Because the Court

(continued...)

of G-DEP codes could help suspects decode information to identify priority given to narcotic investigations, types of criminal activities, and violator ratings. *Id.* ¶ 34. With this information, suspects could change their behavior so as to avoid detection and otherwise thwart the DEA's investigative and law enforcement efforts. *Id.*

G-DEP codes and NADDIS numbers fall within Exemption 2 and routinely are withheld. *See Barbosa v. Dep't of Justice*, No. 06-0867, 2007 WL 1201604, at *3 (D.D.C. Apr. 23, 2007) (concluding that DEA properly withheld violator identifiers consisting of G-DEP codes, NADDIS numbers, and confidential informant numbers which are part of the agency's internal system of identifying information and individuals); *Wilson v. Drug Enforcement Admin.*, 414 F. Supp. 2d 5, 12-13 (D.D.C. 2006) (concluding that G-DEP codes and NADDIS numbers properly are withheld as "high 2" exempt information, and that NADDIS numbers, insofar as they are part of the DEA's internal system of identifying information in which there is no public interest, properly are withheld as "low 2" exempt information). Therefore, DEA's decision to withhold G-DEP codes and NADDIS numbers under Exemption 2 is proper.

e. Army

The Army withholds "internal secure telephone numbers and message addresses" under Exemption 2. Ellis Decl. ¶ 16. These numbers and addresses are used by personnel assigned to USSOUTHCOM in the performance of their official duties. *Id.* ¶ 17. If disclosed, the declarant explains that these personnel could be subjected to "harassing telephone calls which could

---

[18](...continued)
concludes that NADDIS numbers properly are withheld under Exemption 2, there is no need to consider the applicability of Exemption 7(C) with respect to the same information. *See Simon v. Dep't of Justice*, 980 F.2d 782, 785 (D.C. Cir. 1994).

disrupt official business and impede the Intelligence Directorate from effectively accomplishing its mission." *Id.* Moreover, these telephone numbers and addresses are "[r]outine administrative information" the disclosure of which serves no genuine public interest. *Id.*

The Army adequately establishes that these telephone numbers and message addresses are internal administrative information properly withheld as "low 2" exempt information.

### 3. Exemption 3

Exemption 3 covers records that are "specifically exempted from disclosure by statute . . . provided that such statute either "(A) [requires withholding] in such a manner as to leave no discretion on the issue," or "(B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552 (b)(3); *see also Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987).

### a. FBIHQ

FBIHQ withholds from main file 245-HQ-657 "information relating to the lawful interception of communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-20." Hardy I Decl. ¶ 28. Specifically, FBIHQ withholds the number assigned to the interception, the targeted individuals and locations, and information derived from the intercepts. *Id.*

It is true that information pertaining to wiretaps may be withheld under Exemption 3. *See, e.g., Queen v. Gonzales*, No. 96-1387, 2005 WL 3204160, at *5 (D.D.C. Nov. 15, 2005) (withholding information consisting of the identities of individuals and telephone numbers targeted in the FBI's criminal investigation of Plaintiff, the dates, times, and participants in the

wiretaps, and both the summarized content and the actual content of the transcript of a particular intercepted communication); *Butler v. United States Dep't of Justice*, No. 86-2255, 1994 WL 55621, at *9 (D.D.C. Feb. 3, 1994) (holding that affidavits submitted in support of a wiretap issued pursuant to Title III are exempt). FBIHQ's declaration is incomplete, however, as it neither explains that it had no discretion on the decision to withhold this information nor sets forth the particular criteria applied in reaching its decision to withhold the wiretap information in full.

### b. BATFE

BATFE's decision to withhold in full "Firearms Trace Reports wholly derived from the contents of the Firearms Trace System Database," Graham Decl. ¶ 13, is based on two public laws which prohibit the expenditure of funds to disclose records collected or maintained pursuant to 18 U.S.C. § 923(g). *See id.* ¶¶ 11-12. The Consolidated Appropriations Act of 2003, Pub. L. No. 108-7, 117 Stat. 11, in relevant part provides:

> No funds appropriated under this Act or any other Act with respect to any fiscal year shall be available to take any action based upon any provision of 5 U.S.C. [§] 552 with respect to records collected or maintained pursuant to [18 U.S.C. § 923(g)(3), (7)], or provided by Federal, State, local or foreign law enforcement agencies in connection with . . . the tracing of a firearm[.]

*Id.* The Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, 118 Stat. 2809, in relevant part provides:

> That no funds appropriated under this or any other Act with respect to any fiscal year may be used to disclose part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms, and Explosives or any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be

> reported pursuant to paragraphs (3) and (7) of such section 923(g), to
> anyone other than a Federal, State, or local law enforcement  agency
> or a prosecutor solely in connection with and for use in a bona fide
> criminal investigation or prosecution[.]

*Id.*  The Firearms Trace Reports at issue here are "derived from information required to be kept

by a Federal Firearms Licensee (FFL) pursuant to 18 U.S.C. § 923(g)."  Graham Decl. ¶ 13.

Because Congress prohibits the expenditure of funds for release of such records, BATFE

properly withholds them in full under Exemption 3.  *See Watkins v. Bureau of Alcohol, Tobacco,*

*Firearms and Explosives*, No. 04cv800, 2005 WL 2334277, *1 (D.D.C. Sept. 1, 2005)

(concluding that 2005 appropriations legislation "prevent[s] the public release of sensitive

firearms trace data not so much for budgetary reasons than out of concern that such disclosures

could jeopardize criminal investigations").

### c.  DIA

DIA withheld portions of four documents under Exemption 3 "because they specifically

identify the names, office affiliations and titles of DIA personnel."  Kinsey Decl. ¶ 21.

Disclosure of such information, DIA explains, is prohibited under 10 U.S.C. § 424.  *Id.*  That

statute prohibits the disclosure of "the organization or any function of" the DIA, or "the number

of persons employed by or detailed to [the DIA], or the name, official title, occupational series,

grade, or salary of such person."  10 U.S.C. § 424(a).  DIA establishes that the withholding of

this information is mandatory and thus is exempt from disclosure under Exemption 3.

### 4.  Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorand[a] or

letters which would not be available by law to a party other than an agency in litigation with the

agency." 5 U.S.C. § 552(b)(5). "[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery; if material is not 'available' in discovery, it may be withheld from FOIA requesters." *Burka v. United States Dep't of Health and Human Servs.*, 87 F.3d 508, 516 (D.C. Cir. 1996); *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975).

The deliberative process privilege "shields only government 'materials which are both predecisional and deliberative.'" *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 616 (D.C. Cir. 1997) (quoting *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)). To show that a document is predecisional, the agency need not identify a specific final agency decision; it is sufficient to establish "what deliberative process is involved, and the role played by the documents at issue in the course of that process." *Heggestad v. United States Dep't of Justice*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980)). A document is "deliberative" if it "makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). The deliberative process privilege is thought to "prevent injury to the quality of agency decisions." *Sears, Roebuck & Co.*, 421 U.S. at 151. Such protection encourages frank discussion of policy matters, prevents premature disclosure of proposed policies, and avoids public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).

Attorney work product is among the types of material that is not available in discovery. *See*, *e.g.*, *Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 27 (1983). The attorney

work-product privilege protects material gathered and memoranda prepared by an attorney in anticipation of litigation. *See Hickman v. Taylor*, 329 U.S. 495 (1947). Records are properly withheld as attorney work product if they contain the "mental impressions, conclusions, opinions or legal theories of an attorney" and were "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3). The privilege also "covers factual materials prepared in anticipation of litigation." *Heggestad*, 182 F. Supp. 2d at 8 (citing *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d at 620). Attorney work product can be protected under the deliberative process privilege. *Heggestad*, 182 F. Supp. 2d at 7.

### a. FBIHQ

Under Exemption 5, FBIHQ withheld information pertaining to "discussions between FBI officials and other law enforcement and prosecutory officials in the United States and St. Kitts and Nevis." Hardy IV Decl. ¶ 42. The parties discussed "the caliber of evidence possessed against plaintiff and others, the proper jurisdictions and venues in which to bring possible legal actions against plaintiff and others, the type and nature of charges that could be brought, and the possible repercussions of such actions in the United States and in other countries." *Id.* Also withheld was a memorandum prepared "after plaintiff issued threats to kill students at Ross University in St. Kitts if he was [sic] remanded into custody." *Id.* Officials then "were discussing the vulnerabilities and options available to law enforcement if plaintiff attempted to carry out his threat." *Id.*

FBIHQ establishes that information reflecting discussions between and among officials in the United States and St. Kitts not only is predecisional but also is deliberative. It shows that the parties involved discussed options and potential consequences before taking action against

plaintiff and others.   Consequently, this information is protected from disclosure by the

deliberative process privilege and properly is withheld under Exemption 5.

b.  Criminal Division

The Criminal Division withheld "substantive or draft memoranda prepared by Division

attorney's [sic] in conjunction with their preparation for and development of plaintiff's

extradition for drug related offenses from St. Kitts."  Def.'s Reply, Declaration of Kathy Hsu

("Hsu Decl.") ¶ 12.  These memoranda were prepared "in anticipation of prosecuting the plaintiff

for cocaine related offenses and his extradition for such crimes."  *Id.* ¶ 14.  Reflected in the

memoranda were "these attorneys' legal analysis, thoughts, and assessments of facts and issues

upon which an attorney could evaluate a case and formulate litigative strategies and positions."

*Id.*  Disclosure of such information provides "insight into Division attorneys' thought processes

in developing a drug and extradition case," as well as their "general strategy and tactical

approach to investigating and prosecuting such cases."  *Id.* ¶ 16.  For these reasons, the Criminal

Division withheld this information in full under Exemption 5 as attorney work product.  *Id.* ¶¶

13-16.

The Criminal Division also withheld under the attorney work product privilege a formal

opinion prepared by an English barrister at DOJ's request pertaining to the decision of a St. Kitts

magistrate denying the United States' request for plaintiff's extradition.  Hsu Decl. ¶¶ 20-21.

The barrister had "expertise in English law, a matter in which Justice Department attorneys

would have only limited knowledge," and offered his analysis of the facts and critique of the

magistrate's decision "against the background of English legal standards."  *Id.* ¶ 21.  Although

the barrister is an independent contractor, the Criminal Division contended that he acted "in the

same capacity that a Department of Justice attorney would [have acted.]" *Id.* ¶ 22.

The withholding of the information described above by the Criminal Division, including the barrister's opinion, is proper as it is attorney work product shielded from disclosure by Exemption 5.

### c. State Department

Under Exemption 5's deliberative process privilege, the State Department withheld in full an unnumbered draft telegram dated February 18, 2000 (Doc. F27A) from Embassy Bridgetown to the State Department. Grafield Decl. ¶¶ 25, 96. It was a draft, and for this reason the declarant concluded that its "predecision information is exempt from disclosure" under FOIA's Exemption 5. *Id.* ¶ 100. While the declarant described generally the content of the telegram, portions of which properly were withheld under Exemption 1, it is not clear that the information at issue is deliberative in that it "makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1143-44.

The State Department also withheld telegrams under the attorney-client privilege. In telegram 1432 (Doc. F24), a lawyer representing the United States in plaintiff's extradition case "expresse[d] to U.S. officials his opinion about an aspect of the case that could affect the outcome." Grafield Decl. ¶ 61. Also withheld were portions of telegrams 1593 (Doc. F23), 700 (Doc. F25), and 895 (Doc. F52), *id.* ¶¶ 87-88, 90, because they "contain[ed] information exchanged between the U.S. government and attorneys representing the U.S. government regarding the conduct of the case, information which is protected under the attorney-client privilege." *Id.* ¶ 94. These telegrams properly were withheld under Exemption 5.

d. EOUSA

EOUSA withholds in full three documents: a draft grand jury indictment (3 pages), a "Certificate of Trial Attorney" (1 page), and a draft affidavit supporting the request for plaintiff's extradition (11 pages).[19]  Def.'s Reply, Declaration of John F. Boseker ("Boseker Decl.") ¶¶ 11, 13.  The declarant explains that these documents were components of a single fax transmission from the United States Attorney's Office for the Southern District of Florida to another DOJ office and pertained to grand jury proceedings involving plaintiff and other individuals.  *See id.* The draft grand jury indictment bears neither a grand jury number nor a foreperson's signature. *Id.* ¶ 11.  The "Certificate of Trial Attorney" bears no case number, is signed by an Assistant United States Attorney, and includes an FBI notation that the document had been reviewed for classification status.  *Id.*  The draft affidavit of an unidentified third party anticipates the indictment of plaintiff and other individuals, includes handwritten revisions to the text, and refers to evidence and sources of evidence.  *Id.*  In addition, the documents mention the names of third parties and refer to the anticipated indictment and supporting evidence, including the sources of that evidence.  *See id.*

Relying both on Exemptions 3 and 5, EOUSA withholds these documents in full.  The declarant explains that the records fall within the scope of Exemption 3 because their disclosure would "reveal the scope of the grand jury and the direction of the investigation by providing the identities of the targets of the investigation, the source of the evidence, as well as the actual

---

[19]    FBIHQ referred these records to the Criminal Division which, in turn, referred them to EOUSA.  Hsu Decl. ¶ 6; Boseker Decl. ¶ 6.

evidence produced before the grand jury."[20]  Boseker Decl. ¶ 15.  To the extent that the

documents "reflect such matters as trial preparation, trial strategy, interpretation, personal

evaluations and opinions pertinent to Mr. Miller's criminal case," the EOUSA withholds them as

attorney work product under Exemption 5.  *Id.* ¶ 18.  Lastly, because the documents reflect

"predecisional communications among government personnel such as discussions of various

litigation issues, alternatives, and strategies," EOUSA relies, too, on the deliberative process

privilege.  *Id.* ¶ 19.  These documents were properly withheld from disclosure in full under

Exemptions 3 and 5.[21]

### 5. Exemption 6

    Exemption 6 protects from disclosure "personnel and medical files and similar files the

disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5

U.S.C. § 552(b)(6).  Information that applies to a particular individual meets the threshold

requirement for Exemption 6 protection.  *See United States Dep't of State v. Washington Post

Co.*, 456 U.S. 595, 602 (1982).  Furthermore, the exemption requires "a balancing of the

---

[20]    The Federal Rules of Criminal Procedure prohibit disclosure of "matters occurring before
[a] grand jury."  Fed. R. Crim. P. 6(e)(2); *see In re Motions of Dow Jones & Co., Inc.*, 142 F.3d
496, 498-501 (D.C. Cir.), *cert. denied sub nom. Dow Jones & Co., Inc. v. Clinton*, 525 U.S. 820
(1998).  Rule 6(e) qualifies as a "statute" for purposes of FOIA Exemption 3 because Congress
affirmatively enacted it.  *Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.,* 656
F.2d 856, 867-68 (D.C. Cir. 1981).  Generally, grand jury materials fall within the scope of
Exemption 3 if disclosure of the materials at issue would "tend to reveal some secret aspect of
the grand jury's investigation, such matters as the identities of witnesses or jurors, the substance
of testimony, the strategy or direction of the investigation, the deliberations or questions of
jurors, and the like."  *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 582 (quoting *Sec.
& Exch. Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir.) (en banc), *cert. denied*,
449 U.S. 993 (1980)).
[21]    Because the Court concludes that these records properly were withheld under Exemptions
3 and 5, it will not address EOUSA's reliance on Exemption 7(C) in conjunction with the same
material.  *See Simon*, 980 F.2d at 785.

individual's right of privacy against the preservation of the basic purpose of the Freedom of

Information Act 'to open agency action to the light of public scrutiny.'" *Dep't of the Air Force v.*

*Rose*, 425 U.S. 352, 372 (1976); *see United States Dep't of Justice v. Reporters Comm. for*

*Freedom of the Press*, 489 U.S. 749, 756 (1989). The privacy interest at stake belongs to the

individual, not the agency. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 763-65;

*Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) (noting

individual's significant privacy interest "in avoiding the unlimited disclosure of his or her name

and address"), *cert. denied*, 494 U.S. 1078 (1990). It is the requester's obligation to articulate a

public interest sufficient to outweigh an individual's privacy interest, and the public interest must

be significant. *See Nat'l Archives and Records Admin. v, Favish*, 541 U.S. 157, 172 (2004).

### a. DIA

DIA withholds from one document, an Intelligence Report pertaining to threats to United

States citizens, information which would reveal "personally identifiable information linking

named individuals to alleged international narcotics trafficking activities" if publicly released.

Kinsey Decl. ¶ 23 & Attach. (Listing of Documents Withheld) at 1 (Document Number 2). The

declarant states that disclosure "would constitute an[] unwarranted invasion of the personal

privacy of U.S. government personnel, civilian contractors, or foreign nationals." *Id.*, Attach. at

1. "[M]ention of these individuals associated with the plaintiff . . . may cast them in an

unfavorable or negative light to the public, either here on in St. Kitts," and absent a public

interest in disclosure, DIA withholds this information under Exemption 6. *Id.* ¶ 23.

Withholding this information was proper. The privacy interests of these individuals

prevail absent any showing by plaintiff that a significant public interest justifies disclosure of the

information.

### b. State Department[22]

The State Department withheld in part telegram 2021 (Doc. F16) dated August 7, 1998, under Exemption 6. Grafeld Decl. ¶ 51. Staff redacted a "phrase which describes a named individual's personal travel to another country" on the ground that its disclosure "would constitute a clearly unwarranted invasion of personal privacy, and would serve no identifiable public interest." *Id.* ¶ 52. Again, absent any articulated public interest in disclosure, the court concludes that this information properly was withheld under Exemption 6.

### c. Army

The Army withheld from two documents the name or names of and identifying information about an individual or individuals. Ellis Decl. ¶ 18; *see id.*, Ex. 1 at 3 & Ex. 4 at 2. Its declarant concludes that disclosure of this information was not warranted absent an articulated public interest, that is, the likelihood that disclosure "would shed light on the USSOUTHCOM's performance of its mission to protect and defend the United States," outweighs the individuals' privacy interest. *Id.* ¶ 19. The Army's decision was correct.

### 6. Exemption 7

### a. Law Enforcement Records

Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure of such records would cause an

---

[22]    The State Department withholds 41 documents in full or in part under Exemption 6. Grafeld Decl. ¶ 26. Only with respect to one document does the agency rely on Exemption 6 alone. *See id.* ¶ 51. Insofar as the State Department relies on Exemption 6 in conjunction with Exemption 7's provisions for law enforcement records, the matter is addressed below in the discussion of Exemption 7.

enumerated harm.  5 U.S.C. § 552(b)(7); *see Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 622 (1982).  In order to withhold materials properly under Exemption 7, an agency must establish that the records at issue were compiled for law enforcement purposes, and that the material satisfies the requirements of one of the subparts of Exemption 7.  *See Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982).  In assessing whether records are compiled for law enforcement purposes, the "focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 176-77 (D.C. Cir. 2002) (citations and internal quotations omitted).

### *i.*  FBIHQ

FBIHQ readily establishes that the records it located in response to plaintiff's FOIA request were compiled for law enforcement purposes.  The records "relate to an Organized Crime Drug Enforcement Task Force," the goal of which was to "identify, investigate, and prosecute members of high-level drug trafficking enterprises, and to dismantle the operations of those organization[s]."  Hardy I Decl. ¶ 46.  In this case, the FBI "assisted the St. Kitts and Nevis authorities at their request and recorded the assistance in a file entitled Foreign Police Cooperation – General Criminal Matters; conducted a Racketeering Enterprise Investigation [] – Central/South American Organizations; and recorded information in files entitled Foreign Political Matters and Administrative Matters."  Hardy IV Decl. ¶ 65.

At the request of the Ministry of Foreign Affairs of St. Christopher and Nevis, the FBI assisted local police in investigating the disappearance of the St. Kitts-Nevis Deputy Prime Minister's son and his female companion.  Hardy IV Decl. ¶ 5.  The investigation revealed that

the victims found a 300-kilogram shipment of cocaine buried on a beach. *Id.* Plaintiff and other individuals kidnapped the victims, tortured them, and burned their dismembered bodies in a vehicle. *Id.* The investigation's suspects also assassinated the Superintendent of Police who was investigating the victims' disappearance with the FBI's assistance. *Id.* In addition, plaintiff was suspected of having threatened to murder American students attending the Ross Veterinary University in St. Kitts if he were extradited to the United States on charges of conspiracy to smuggle nearly a ton of cocaine from St. Kitts to Miami, Florida. *Id.*

### *ii.* Criminal Division

Records referred by FBIHQ to the Criminal Division originated in the Criminal Division's Office of International Affairs ("OIA"), the office charged with "coordinat[ing] the extradition of international fugitives as well as international evidence gathering." Hsu Decl. ¶ 5 n.1. The relevant records "were compiled for [OIA's use] to extradite plaintiff, who was a fugitive, back to the United States from St. Kitts." *Id.* ¶ 28. Plaintiff had been indicted and was to stand trial in the United States District Court for the Southern District of Florida for several drug-related offenses. *Id.* Thus, the Criminal Division establishes that its records were compiled for law enforcement purposes.

### *iii.* BATFE

The records referred by FBIHQ to BATFE "were created by [BATFE] in accordance with [its] law enforcement functions," which include the criminal and regulatory enforcement of federal laws pertaining to firearms and explosives. Graham Decl. ¶ 14. Specifically, the relevant records (a fax cover sheet for a Firearms Trace Report and the four-page report itself) "were compiled in connection with an investigation into a drug related crime involving a firearm." *Id.* ¶

40

18 & *Vaughn* Index.  BATFE meets its threshold showing that its records were compiled for law enforcement purposes.

### iv.  DEA

Pursuant to the Comprehensive Drug Abuse Prevention and Control Act of 1970, DEA is authorized to investigate "incidences involving the trafficking in controlled substances, dangerous drugs and precursor chemicals and the violators who operate at interstate and international levels," and to "cooperate with counterpart agencies abroad and to exchange information in support of drug traffic prevention and control," among other functions.  Wassom Decl. ¶ 36.  DEA describes the relevant responsive record originating from DEA as a 10-page document known as a "cable," that is, a memorandum prepared in lieu of a DEA Report of Investigation (DEA Form 6).  *Id*. ¶ 28.  Its declarant explains that this cable is a "criminal investigative record[] . . . compiled during criminal law enforcement investigations of the plaintiff and several third parties."  *Id.* ¶ 37.  DEA, too, meets its threshold showing that its records were compiled for law enforcement purposes.

### v.  State Department

The State Department asserts that it is entitled to withhold records or portions of records under Exemptions 7(C) and 7(D).  It relies on FBIHQ's explanation (which the Court has accepted) that the information it located in its systems of records was compiled for law enforcement purposes.  *See* Grafeld Decl. ¶¶ 50, 57, 67, 80, 84, 91, 98 (referring to Hardy I Decl. ¶ 46).  The State Department's supporting declaration purports "to confirm the disposition of three referrals to the [State Department] that originated with [FBIHQ] as part of the FOIA request in this lawsuit."  *Id*. ¶ 3.

It is not accurate to characterize the telegrams at issue as originating with FBIHQ. Rather, the referral from FBIHQ to the State Department reflects that the telegrams originated with the State Department. *See* Hardy IV Decl. ¶ 106. The fact that FBIHQ compiled records (including telegrams from Embassy Bridgetown to the State Department) for law enforcement purposes does not establish that the State Department initiated, created or compiled these telegrams for law enforcement purposes.[23] The State Department's supporting declaration neither explains adequately the manner and circumstances under which the telegrams were compiled nor links these telegrams to any enforcement proceeding. Referral of these telegrams from FBIHQ to the State Department alone does not cause them to become law enforcement records for purposes of Exemption 7.

The State Department does not meet its threshold showing for purposes of Exemption 7. The court will defer consideration of the State Department's decisions to withhold records under Exemptions 7(C) and 7(D), in conjunction with Exemption 6, until such time as the State Department has an opportunity to clarify its position.

b. Exemption 7(C)

Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(7)(C). In determining whether this exemption applies to particular material, the Court must balance the interest in privacy of individuals mentioned in the records against the

---

[23]    Two of the telegrams (Docs. F1 and F2) were sent by DEA officials at Embassy Bridgetown to DEA officials in London. Grafeld Decl. ¶ 35. The State Department considered these telegrams to be DEA records and accordingly referred them to DEA for its direct response to plaintiff. *Id.* From DEA's explanation, it is reasonable to conclude that these two telegrams were compiled for law enforcement purposes.

public interest in disclosure. *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993).

Individuals have a "strong interest in not being associated unwarrantedly with alleged criminal

activity." *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 91-92 (D.C. Cir. 1984). "[T]he

only public interest relevant for purposes of Exemption 7(C) is one that focuses on 'the citizens'

right to be informed about what their government is up to.'" *Davis v. United States Dep't of*

*Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *Reporters Comm. for Freedom of the*

*Press*, 489 U.S. at 773).

*i.* Law Enforcement Personnel and Support Personnel

FBIHQ[24]

FBIHQ withheld the names of and identifying information about its Special Agents and

support personnel who conducted, assisted, or supervised the investigation as reported in the

responsive records. Hardy I Decl. ¶ 51; Hardy IV Decl. ¶ 68. Among other functions, these

individuals conducted interviews with cooperating witnesses and reviewed materials compiled in

the course of the investigation. Hardy IV Decl. ¶ 68.

Special Agents "are not assigned to investigations or administrative duties by choice."

Hardy IV Decl. ¶ 68. Their official duties require "contact with all strata of society" in, for

example, "conduct[ing] searches and mak[ing] arrests, both of which constitute reasonable, but

---

[24] FBIHQ invokes both Exemption 6 and Exemption 7(C) to justify its decision to withhold the names of and identifying information about third parties, including law enforcement personnel, support personnel, third parties of investigative interest to law enforcement agencies, third parties interviewed during the course of the investigation, and third parties merely mentioned in these responsive records. Hardy I Decl. ¶¶ 33, 35, 38, 41; Hardy IV Decl. ¶¶ 68, 71, 73-74, 77, 79, 81, 84. The court concludes that this information properly is withheld under Exemption 7(C), and, therefore, need not consider whether Exemption 6 applies to the same information. *See Simon*, 980 F.2d at 785.

nonetheless serious intrusions into peoples' lives." *Id.* These people may "carry grudges which last for years and they may seek any excuse to harass the [Special Agent] deemed responsible for these intrusions." *Id.* Any publicity connecting a Special Agent with a particular investigation "could trigger hostility" toward the Special Agent. *Id.* ¶ 69. Release of his or her identity, for example, "could rekindle animosity toward the [Special Agent]," and for this reason an Agent maintains a substantial privacy interest in not having his or her identity disclosed. *Id.* FBIHQ submits that there is no public interest to outweigh the individuals' privacy interests, as disclosure of their identities sheds no light on the FBI's mission or function. *Id.* ¶ 70.

Similarly, FBI support personnel were assigned to perform tasks related to the investigation of plaintiff and others. Hardy I Decl. ¶ 53; Hardy IV Decl. ¶ 69. These employees were, or still are, in positions from which they have "access to information regarding official law enforcement investigations, and therefore could become the target[s] of harassing inquiries for unauthorized access to investigations if their identities were disclosed." Hardy IV Decl. ¶ 69. This rationale applied equally to FBIHQ's decision to withhold the names of non-FBI federal employees and the names of and identifying information about local and foreign law enforcement personnel. *Id.* ¶¶ 71-72, 79-80, 84-85; Hardy I Decl. ¶¶ 54-55, 64. The non-disclosure of this information is proper.

Criminal Division

The Criminal Division withholds the "names of and/or other identifying information of paralegals employed by [OIA and the] names of individuals who are agents employed by DEA." Hsu Decl. ¶ 26. Its declarant states that "[i]dentifying paralegals [and] DEA agents . . . could subject these individuals to harassment, retaliation, and reprisals as well as increase the

44

difficulties of duties which require a low profile." *Id.* ¶ 29. In addition, disclosure of this information "is unlikely to add to the public's understanding of how an agency works or how well it performs its statutory duties." *Id.* ¶ 30. The court concurs.

BATFE

BATFE withholds "the names, addresses, phone numbers, and other identifying information related to law enforcement officers and personnel," Graham Decl. ¶ 21, on the ground that disclosure of their identities "might seriously prejudice their effectiveness in conducting investigations to which they are assigned or subject them to unwarranted harassment." *Id.* ¶ 22. Plaintiff "did not assert any discernible public interest" in disclosure of this information, and, therefore, the declarant concludes that the privacy interest of these BATFE employees "substantially outweigh[s] any public interest" in disclosure. *Id.* ¶ 23. BATFE is correct.

DEA

DEA withholds the "names and other identifying information which would reveal the identity of and disclose personal information about individuals who were involved or associated with the plaintiff. " Wassom Decl. ¶ 38. Specifically, DEA withholds information about "government employees, including DEA and FBI Special Agents, and a DEA non-drug evidence custodian."[25] *Id.* ¶ 43. The declarant explains that DEA Special Agents, other Federal, state or

---

[25]    Although DEA's declarant does not state explicitly that the names of DEA Special Agents, Supervisory Special Agents, FBI Special Agents, a United States Customs Service Special Agent, and state and local law enforcement officers are withheld under both Exemptions 7(C) and 7(F), review of the *Vaughn* Index suggests that this is the case. *See* Wassom Decl. ¶¶ 47-50 & Ex. Q (*Vaughn* Index). Because names of such law enforcement officers properly are withheld under Exemption 7(C), the Court need not address whether Exemption 7(F) applies to

(continued...)

local law enforcement officers and support personnel "may suffer undue invasions of privacy, harassment and humiliation from disclosure of their identities." *Id.* ¶ 41. The law enforcement officers in this case "were assigned to handle tasks relating to the official investigation into the criminal activities of the plaintiff," and they "were, and possibly still are, in positions of access to information regarding official law enforcement investigations." *Id.* ¶ 42. Release of their identities may result in their becoming "targets of harassing inquiries for unauthorized access to information pertaining to ongoing and closed investigations." *Id.* No legitimate public interest in disclosure is identified, and their privacy interests thus prevail. *See id.* ¶ 40. DEA is correct.

Redaction of the names of federal, state and local law enforcement personnel and support staff under circumstances similar to those described here routinely is upheld. *See Lesar v. United States Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980) (finding legitimate interest in preserving the identities of government officials where disclosure could subject them to annoyance or harassment in either their official or private lives); *Pray v. Dep't of Justice*, 902 F. Supp. 1, 3 (D.D.C. 1995) (finding that "animosity or grudges toward special agents" resulting from release of information outweighed any possible benefit from disclosure), *aff'd in relevant part*, 1996 WL 734142 (D.C. Cir. Nov. 20, 1996). The court concludes that FBIHQ, the Criminal Division, BATFE, and DEA properly withheld the names of and identifying information about federal, state, local and foreign law enforcement officers and support staff under Exemption 7(C).

---

[25](...continued)
the same information. *See Simon*, 980 F.2d at 785.

*ii*. Third Parties of Investigative Interest

FBIHQ

Under Exemption 7(C), FBIHQ withholds the names, addresses, dates of birth, social security numbers, federal registry numbers, and other personal information about third parties of investigative interest to the FBI or other law enforcement agencies, third parties who were interviewed during the course of the investigation, and third parties who merely are mentioned in these records. Hardy I Decl. ¶¶ 56, 59, 62; Hardy IV Decl. ¶¶ 73-74, 77. Exemption 7(C) recognizes that the stigma of being associated with any law enforcement investigation affords broad privacy rights to those who are connected in any way with such an investigation unless a significant public interest exists for disclosure. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773-775; *SafeCard Servs., Inc.*, 926 F.2d at 1205-06. Release of their identities to the public "could subject them to harassment or embarrassment, as well as undue public attention," Hardy IV Decl. ¶ 73, and in some cases "could threaten their physical safety." Hardy I Decl. ¶ 56. In no case does FBIHQ identify a public interest in disclosure to outweigh these individuals' legitimate, recognized privacy interests. Hardy I Decl. ¶¶ 57-58, 60-61, 63; Hardy IV Decl. ¶¶ 73-76,78. Absent any showing by plaintiff that disclosure of this information is in the public interest, FBIHQ's decision is proper.

c. Exemption 7(D)

Exemption 7(D) protects from disclosure those records or information compiled for law enforcement purposes that:

> could reasonably be expected to disclose the identity of a confidential
> source . . . [who] furnished information on a confidential basis, and,
> in the case of a record or information compiled by a criminal law

> enforcement authority in the course of a criminal investigation. . .,
> information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). There is no assumption that a source is confidential for purposes of

Exemption 7(D) whenever a source provides information to a law enforcement agency in the

course of a criminal investigation. *See United States Dep't of Justice v. Landano*, 508 U.S. 165,

181 (1993). Rather, a source's confidentiality is determined on a case-by-case basis. *Id*. at 179-

80. "A source is confidential within the meaning of 7(D) if the source provided information

under an express assurance of confidentiality or in circumstances from which such an assurance

could reasonably be inferred." *Williams v. Fed. Bureau of Investigation*, 69 F.3d 1155, 1159

(D.C. Cir. 1995) (citing *Landano*, 508 U.S. at 170-74).

### *i*. Express Grant of Confidentiality

Where a law enforcement agency relies on express assurances of confidentiality to justify

its decision to withhold information under Exemption 7(D), it must offer "probative evidence

that the source did in fact receive an express grant of confidentiality." *Campbell*, 164 F.3d at 34

(quoting *Davin v. United States Dep't of Justice*, 60 F.3d 1043, 1061 (3d Cir. 1995)). Such

evidence may take many forms, such as notations on the face of the withheld document, an

official's personal knowledge about the source, a statement from the source, or documents

discussing practices or policies for dealing with the source at issue or similarly situated sources.

*Id.*

48

FBIHQ[26]

Symbol-Numbered Source[27]

The FBI assigned a source symbol number to a confidential source who has been "developed, instructed, closely monitored and in many cases paid for his/her services" and who has "report[ed] information to the FBI under an express grant of confidentiality." Hardy IV Decl. ¶ 91. Here, a confidential source "provided valuable information concerning plaintiff and other persons who are of investigative interest to the FBI or other law enforcement agencies during the course of this investigation." *Id.* ¶ 92. Because the information provided was "detailed and singular in nature concerning certain criminal activity," a person knowledgeable of the events giving rise to this investigation could discern his or her identity. *Id.* The source and his or her family "could be subjected to embarrassment, humiliation, and physical/mental harm" if his or her identity were disclosed *Id.* Further, disclosure of this FBI confidential source's identity "could have a chilling effect on the activities and cooperation of other FBI confidential sources." *Id.* Experience has shown the FBI that its sources must be free to provide information "without fear of reprisal" and "without the understandable tendency to hedge or withhold information out of fear that their names or their cooperation with the FBI will later be made public." *Id.* ¶ 89.

Case law fully supports FBIHQ's decision to withhold under Exemption 7(D) information pertaining to a symbol numbered source and information he or she provided. *See, e.g., Putnam v.*

---

[26]    In this case, FBIHQ withholds under both Exemptions 7(C) and 7(D) the name and identifying information about one third party who provided information to the FBI. Hardy IV Decl. ¶¶ 81-83, 94. "The phrase 'protect ID' appears in the documents, providing evidence of the express grant of confidentiality to this source." *Id.* ¶ 81. This information properly is withheld under either exemption.

[27]    The source symbol number itself properly was withheld under Exemption 2.

49

*United States Dep't of Justice*, 873 F. Supp. 705, 716 (D.D.C. 1995) (concluding that permanent symbol numbers assigned to confidential sources, file numbers and information that could be used to identify the sources were properly withheld under Exemption 7(D)).  Consequently, this information properly is withheld under Exemption 7(D).

Third Party Requesting Confidentiality

FBIHQ withheld the identity of a third party interviewee who provided information during the course of the FBI's investigation of plaintiff and other individuals.  Hardy IV Decl. ¶ 93.  At the interviewee's request, prior to the interview, FBI personnel "expressly promised [that] his/her identity and the information provided would not be disclosed," and the phrase "protect ID" appears in the records when this individual's name is referenced.  *Id.*

In light of the "violent nature of the crimes reportedly committed by plaintiff," Hardy IV Decl. ¶ 94, the court accepts the FBIHQ's explanation that disclosure of this informant's identity "could subject him/her to violent reprisals."  *Id.*  FBIHQ establishes that the source provided information under an express grant of  confidentiality.  His or her identity as well as the information he or she provided properly are withheld under Exemption 7(D).

Foreign Law Enforcement Authorities

Under Exemption 7(D), FBIHQ withheld the identity of and information provided by foreign law enforcement authorities.  Hardy IV Decl. ¶ 95.  Those authorities provided information pursuant to an agreement with the FBI, and the agreement specifies "the extent of confidentiality requested by the [] foreign authorit[y]."  *Id.*  However, the declarant does not describe the nature or scope of the agreement with these particular law enforcement authorities. It remains unclear whether these sources provided information under an express grant of

50

confidentiality.

*ii*. Implied Grant of Confidentiality

FBIHQ

FBIHQ withheld the names of and information provided by an individual "during the course of the investigation about attempting to purchase drugs from one of plaintiff's numerous co-conspirators," but only to the extent that the information would identify that individual. Hardy I Decl. ¶ 69. Also withheld was similar information about individuals "interviewed under circumstances from which an assurance of confidentiality may be implied." Hardy IV Decl. ¶ 90. These sources "provided specific detailed information that is singular in nature concerning the criminal activities involving plaintiff, his associates and/or other subjects of this investigation." *Id.* Given plaintiff's "reported criminal history of kidnapping and the subsequent torture, murder and dismemberment of bodies," FBIHQ asserted that these sources would not have provided any information to law enforcement without an implied promise of confidentiality. *Id.*

Courts have held that the violence and risk of retaliation attendant to drug trafficking warrant an implied grant of confidentiality to a source. *See Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1329 (D.C. Cir. 2000) (withholding source supplying information about conspiracy to distribute crack and powder cocaine); *Shores v. Fed. Bureau of Investigation*, No. 98-2728, 2002 WL 230756, at *4 (D.D.C. Feb. 2, 2002) (withholding identities and identifying information of three cooperating witnesses with knowledge of murder of which plaintiff was convicted). It is reasonable in these circumstances to conclude that these sources provided information with an expectation that their identities would not be disclosed. This information properly is withheld under Exemption 7(D).

51

DEA

Among the records referred by FBIHQ to DEA was a 10-page memorandum prepared in lieu of a DEA Report of Investigation (DEA Form 6). Wassom Decl. ¶ 28. Three pages of this document "contain[] information regarding a confidential source" who "provided information about the drug trafficking and other criminal activities of the plaintiff and third parties." *Id.* ¶ 38.[28] Because plaintiff "reportedly was the head of a drug trafficking organization involved with smuggling multi-hundred kilograms of cocaine," DEA claims "[i]t [] reasonable to infer that the individuals who provided the information about the plaintiff would fear for their safety, since violence is inherent in the trade in illicit substances such as cocaine, if their identities or the information they provided was [sic] revealed." *Id.* ¶ 46.

DEA's decision to withhold information from or about a confidential source in these circumstances is proper. Violence and retaliation are foreseeable risks if information pertaining to such drug trafficking activities were disclosed. *See, e.g., Mays*, 234 F.3d at 1329.

d. Exemption 7(E)

Exemption 7(E) protects from disclosure law enforcement records "to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Courts have held that information pertaining to law enforcement techniques and

---

[28]    The numbering of this paragraph appears to be in error, as this paragraph 38 appears on page 14 of the Wassom Declaration between paragraphs numbered 45 and 46.

procedures properly is withheld under Exemption 7(E) where disclosure reasonably could lead to circumvention of laws or regulations.  *See, e.g., Morley v. Cent. Intelligence Agency*, 453 F. Supp. 2d 137, 156 (D.D.C. 2006) (withholding information pertaining to security clearances and background investigations on the ground that "disclosure of CIA security clearance and investigatory processes would risk circumvention of those processes in the future"); *Piper v. United States Dep't. of Justice*, 294 F. Supp. 2d 16, 30 (D.D.C. 2003) (withholding polygraph test information on the ground that disclosure "has the potential to allow a cunning criminal to extrapolate a pattern or method to the FBI's questioning technique," and anticipate or thwart FBI's strategy); *Fisher v. United States Dep't of Justice*, 772 F. Supp. 7, 12 (D.D.C. 1991) (upholding FBI's decision to withhold information about law enforcement techniques where disclosure would impair effectiveness and, within context of documents, "could alert subjects in drug investigations about techniques used to aid the FBI"), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992).

Under both Exemptions 2 and 7(E), FBIHQ withholds a 14-page law enforcement form provided by the FBI's Critical Incident Response Group for use in developing criminals' psychological profiles.  Hardy IV Decl. ¶¶ 38, 97.  The form found in the responsive records is blank; it contains no information about plaintiff or any other individual.  *Id*. ¶ 38.  Although it is common knowledge that law enforcement agencies develop psychological profiles, "the exact nature and type of information used to develop these profiles," FBIHQ submits, "warrants protection" under both Exemptions 2 and 7(E).  *Id.* ¶ 97.  Release of the form "could enable subjects of criminal investigations to circumvent the ability [of] the FBI to effectively use this important law enforcement technique."  *Id.*  Targets of investigations "could develop countermeasures" and thus avoid detection.  *Id.* ¶ 38.

Having reviewed defendant's declaration and its *Vaughn* Index, and, absent any challenge from plaintiff, the court concludes the FBI's Critical Incident Response Group form properly is withheld under Exemptions 2 and 7(E).

### e. Exemption 7(F)

Exemption 7(F) protects from disclosure information contained in law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). "While courts generally have applied Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect 'any individual' reasonably at risk of harm." *Long*, 450 F. Supp. 2d at 79 (quoting 5 U.S.C. § 552(b)(7)(F)). In reviewing matters under Exemption 7(F), courts may inquire "whether there is some nexus between disclosure and possible harm." *Linn v. United States Dep't of Justice*, No. 92-1406, 1995 WL 631847, at *8 (D.D.C. Aug. 22, 1995). Within limits, the Court defers to the agency's assessment of danger. *See Garcia v. United States Dep't of Justice*, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (quoting *Linn*, 1995 WL 631847, at *9).

FBIHQ withholds under Exemption 7(F) information pertaining to a symbol-numbered informant, certain cooperating witnesses, and other third parties who provided information to FBI about the criminal activities of plaintiff and other individuals or who were of investigative interest. Hardy IV Decl. ¶ 99. "[I]n light of the heinous crimes reportedly committed by plaintiff while in St. Kitts, [i]t is reasonable to expect that release of their identities would place them at great risk." *Id.*

"It is in the public interest not to disclose the identity of special agents so that they may

continue to effectively pursue their undercover and investigative assignments." *Jimenez v. Fed. Bureau of Investigation*, 938 F. Supp. 21, 30 (D.D.C. 1996). Exemption 7(F) is a proper basis for withholding the identities of law enforcement agents as well as confidential informants. *See, e.g., Gonzalez v. Bureau of Alcohol, Tobacco, and Firearms*, No. 04-2281, 2005 WL 3201009, at *10 (D.D.C. Nov. 9, 2005) (finding that identities of undercover DEA agents properly withheld under Exemption 7(F)).

Absent any showing by plaintiff that disclosure of this information is on the public interest, the court concludes that FBIHQ properly withholds information pertaining to a symbol-numbered informant, certain cooperating witnesses, and other third parties in these circumstances under Exemption 7(F).

## III.  CONCLUSION

The Court concludes that: (1) FBIHQ conducted reasonable searches for records responsive to plaintiff's FOIA request and that its referrals of records to other DOJ components and federal agencies were appropriate; (2) the Army, the State Department, FBIHQ, and DIA properly withheld information classified either at the Secret or Confidential level under Exemption 1; (3) FBIHQ, BATFE, DIA, DEA, and the Army properly withheld information under Exemption 2; (4) BATFE, and DIA properly withheld information under Exemption 3; (5) FBIHQ, the Criminal Division, and the State Department (Docs. F23, F24, F25, and F52 as attorney work product) properly withheld information under Exemption 5; (6) EOUSA properly withheld information under Exemptions 3 and 5; and (7) DIA, the State Department (Doc. F16), and the Army properly withheld information under Exemption 6. With respect to Exemption 7, the Court concludes that FBIHQ, the Criminal Division, BATFE, and DEA establish that the

records at issue were compiled for law enforcement purposes. Under Exemption 7(C), FBIHQ, the Criminal Division, BATFE, and DEA properly withhold the names of and identifying information about law enforcement officers, support personnel, and third parties of investigative interest. Under Exemption 7(D), FBIHQ properly withholds information pertaining to a symbol-numbered source, an interviewee who provided information under an express grant of confidentiality, and a source who provided singular information about drug trafficking activities under an implied grant of confidentiality. Also under Exemption 7(D), DEA properly withholds information provided by a source under an implied grant of confidentiality. FBIHQ's decision to withhold a blank Critical Incident Response Group form under Exemptions 2 and 7(E) is proper, as is its decision to withhold under Exemption 7(F) information pertaining to a symbol-numbered source, cooperating witnesses, and other third parties providing information to the FBI. In these respects, defendant's motion for summary judgment is granted in part. In all other respects, defendant's motion is denied without prejudice.[29]

Defendant will be directed to renew its summary judgment motion within 45 days of entry of the Order accompanying this Memorandum Opinion. Defendant is expected to address the following matters: (1) disposition of 312 pages of records by FBIHQ to an unidentified federal government agency for its direct response to plaintiff; (2) disposition of records referred by FBIHQ to DEA (Request Nos. 07-0234-P, 07-0339-P, and 07-0664-P) and by the State Department to DEA (Request Nos. 07-0615-P, 07-0616-P, 07-0681-P); (3) the Air Force's decision to withhold in full one document under Exemption 1; (4) FBIHQ's decision to withhold

---

[29]    The Court defers consideration of segregability until such time as it receives further briefing on matters addressed in this Memorandum Opinion.

wiretap information; (5) the State Department's decision to withhold records under Exemptions 5 (Doc. F27A under the deliberative process privilege), 7(C) and 7(D); (6) FBIHQ's decision to withhold under Exemption 7(D) information provided by unidentified foreign law enforcement authorities, and (7) any other matter not resolved in this Memorandum Opinion and Order.


Date:   June 24, 2008                              _____/s/_____
                                                   HENRY H. KENNEDY, JR.
                                                   United States District Judge